IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONTAE SPIVEY, #285631              *
                Plaintiff,
   v.                              *   CIVIL ACTION NO. JFM-07-1272

CORRECTIONAL MEDICAL SERVICES,      *
 INC.
                Defendant.    *
                                  *****

MEMORANDUM

1. <u>Procedural History</u>

This 42 U.S.C. § 1983 civil rights complaint for injunctive relief and damages was received for filing on May 11, 2007. Plaintiff's alleges that he was denied necessary post-operative blood thinner medication, *i.e.*, Lovenox and aspirin, and treatment for symptoms of severe headaches and blurred vision, subsequent to an April 5, 2005 vascular procedure on a major blood vessel in his neck.[1] He claims that as a result he suffered a stroke on April 23, 2005. Plaintiff states that he was housed at the Maryland Correctional Institution in the Hagerstown, Maryland ("MCIH") at all times relevant to his complaint. The complaint originally named Correctional Medical Services, Inc. ("CMS") and Prison Health Services, Inc. ("PHS") as defendants. As CMS was the private medical contractor which provided care to Maryland Department of Public Safety and Correctional Services inmates in the Hagerstown region at that time, the complaint against defendant PHS was dismissed.

---

[1] Plaintiff was stabbed in the neck with an ice pick while in prison in 2002, and underwent right subclavian artery bypass graft surgery. After voicing subjective complaints of numbness, diagnostic testing revealed that the subclavian graft had occluded. An elective right carotid subclavian arterial bypass was performed on April 5, 2005.

2. Pending Motions

On August 7, 2007, CMS filed a motion to dismiss or, in the alternative, motion for summary judgment.[2]  Paper No. 14.  Plaintiff has filed an opposition thereto.[3]  Paper No. 21.  The case may be determined without oral hearing.[4]  *See* Local Rule 105.6. (D. Md. 2004).  For reasons to follow, defendant's dispositive motion, construed as a motion for summary judgment, shall be granted.

3. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex*, 477 U.S. at 322-323.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Where, as here, plaintiff presents a 42 U.S.C. § 1983 complaint alleging the denial of medical care, he must prove two essential elements.  First, he must satisfy the "objective" component by

---

[2] On August 13, 2007, plaintiff filed a declaration for entry of default. Paper No. 16.  As defendant CMS was and is not in violation of federal rules and administrative orders and did file a timely answer, the request, construed as a motion for default, shall be denied.

[3] Inasmuch as plaintiff has filed his opposition, his previously-filed motion for extension of time, *see* Paper No. 18, shall be granted *nunc pro tunc*.

[4] Also pending before this court are plaintiff's motions for appointment of counsel and motion to amend complaint.  Paper Nos. 3, 17, 19, & 20.

illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). Plaintiff experienced an occluded carotid arterial graft and suffered a stroke. Therefore, he has satisfied the first element. He must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."[5] *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Healthcare staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

    4. <u>Analysis of Medical Claims</u>

The complaint names CMS in the alleged denial of medical care premised upon a theory of vicarious liability. The law in this circuit is clear. The doctrine of *respondeat superior* does not apply to § 1983 claims. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999);

---

[5] "[A]ny negligence or malpractice on the part of....doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

*Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). Therefore, the § 1983 claims against CMS are subject to dismissal.

I have also examined the record and exhibits presented by the parties and find no deliberate indifference on the part of CMS or its healthcare employees to plaintiff's serious medical needs. The following information is set out in the medical records.

Plaintiff is a 30-year old male who in 2002 sustained a stab wound to his neck that resulted in an injury to his right subclavian artery. The injury was repaired in 2003 with a right carotid artery to subclavian artery bypass graft. Plaintiff developed claudication of his right upper extremity and angiographic evaluation revealed occlusion of his arterial bypass graft. On April 4, 2005, he was admitted to the University of Maryland Medical Center ("UMMC") for a new bypass graft of his right carotid subclavian artery.

According to Dr. Isaias Tessema, the Medical Director for CMS at the Western Correctional Institution ("WCI"), one of the known complications of graft bypass surgery is occlusion of the graft by a blood clot. Upon his release from UMMC, plaintiff was housed in the infirmary at MCIH for observation and treatment. Part of his prescription regimen was the receipt of enteric-coated aspirin and Lovenox, both anticoagulants used to help prevent the forming of a blood clot in the new graft.[6] On April 21, 2005, plaintiff was transported to the UMMC vascular lab to undergo a bilateral duplex ultrasound study of his carotid arteries. The test showed that plaintiff's right carotid-subclavian artery graft appeared occluded. According to Dr. Tessema, the earliest any CMS personnel saw the report was on May 3, 2005. *Id*.

---

[6] In his opposition plaintiff contends that he only remained in the infirmary "for a day or so" and while he received the Lovenox, he did not receive the enteric-coated aspirin from the time he was released from the infirmary until he had his stroke.

On April 23, 2005, two days after the duplex study was conducted, plaintiff began having blurred vision and pain in the right side of his tongue and face. He was taken to the MCIH dispensary for a walk-up[7] evaluation at 7:45 p.m. He was examined by Nurse Reckley, who took his vital signs and noted that plaintiff showed no signs of weakness in the extremities. Reckley gave plaintiff a Tylenol #3 and advised him to relax. At 8:10 p.m., plaintiff was evaluated by Dr. Odunsi, who observed that plaintiff was confused and had slurred speech.[8] Odunsi ordered plaintiff transported to the Emergency Department of Washington County Hospital ("WCH").[9] Plaintiff was admitted to WCH that night with a diagnosis of a right cerebrovascular accident (stroke) with left upper and lower extremity weakness. While at WCH he received stroke rehabilitation with physical, occupational, and speech therapy. Plaintiff also began taking the anticoagulant drug Coumadin to prevent further accumulation of a clot. On May 3, 2005, he was discharged from WCH and directed to continue physical therapy and take enteric-coated aspirin and Coumadin as ordered. No further speech or occupational therapy was recommended.[10]

---

[7] According to Dr. Tessema, a walk-up evaluation occurs when an inmate has a complaint or injury that the medical staff feels cannot or should not wait for a regularly scheduled appointment.

[8] In his opposition affidavit plaintiff asserts that Nurse Reckley never told him to relax nor did she check him for signs of weakness. He also disputes the times set out in the physician's and nurse's notes.

[9] In his original complaint plaintiff contended that when first brought to the dispensary on a stretcher for evaluation of symptoms of blurred vision, headache, problems talking, and pain in the tongue and face, he was not immediately seen and when finally examined by Nurse Reckley his vital signs were taken, he was given a shot of Lovenox, and told nothing was wrong with him. Plaintiff also claims that Dr. Odunsi "saw me and said I was faking." He alleges that he was told to go back to his tier and while walking back to his tier passed out. He claims as a result of this negligence, he suffered a stroke. In his opposition, plaintiff claims that after his April 4, 2005 surgery Dr. Odunsi did not "monitor" his blood to make sure he was getting the proper amount of blood thinner and that Odunsi and other employees were "deliberately indifferent" as they ignored "an obvious and serious medical need" when he was originally brought to the dispensary on April 23, 2005.

[10] In his opposition plaintiff contends that WCH wanted to keep him hospitalized at that facility to continue therapy and to see a neurologist for follow-up, but CMS would only approve a hospital stay of one week. He now claims that he has not received a neurology follow-up.

On May 3, 2005, plaintiff was admitted to the MCIH infirmary after his discharge from WCH. The infirmary physician, Dr. Ikechukwu Mbonu, continued plaintiff's enteric-coated aspirin and Coumadin, ordered Elavil to treat plaintiff's neurological pain, and directed that plaintiff receive physical therapy, which he did, from May 4, 2005 to June 7, 2005. On June 9, 2005, plaintiff was transferred to WCI for one-on-one physical therapy and was housed in the WCI infirmary. Dr. Tessema noted that plaintiff's gait had progressively improved, he was able to walk without assistance, and he had become independent in his daily living activities with the use of assistive devices such as an ankle-foot orthotic, a cane, a rubber hand exerciser, and a device that helped him put on his socks. Dr. Tessema prescribed Nortriptyline and enteric-coated aspirin.

On July 18, 2005, plaintiff was evaluated in the Outpatient Clinic at UMMC and released from further follow-up by the UMMC physicians. On October 7, 2005, plaintiff was released from the WCI infirmary to a housing unit. The following day he signed off on all his medications, including the enteric-coated aspirin and Nortriptyline.

On October 13, 2005, plaintiff fell while on his housing tier and struck his right elbow. He was examined in the dispensary and a nurse noted some slight swelling, but no bruising or abrasions. Plaintiff was given ice to apply to his elbow three times a day for two days. On October 14, 2005, Tessema conducted a follow-up examination after plaintiff's infirmary release, noting that plaintiff was able to perform daily living activities without assistance and was able to walk well using his ankle-foot orthotic and cane for balance.

Tessema again evaluated plaintiff on November 16, 2005. Plaintiff noted that he had feeling and ability to move his left hand as a result of physical therapy. He requested a single cell, a handrail by the toilet in his cell, and a longer time to shower. While a single cell was not medically

indicated, Dr. Tessema requested that plaintiff be provide a bottom bunk, a toilet with a handrail, and more shower time for a one-year period.

On December 1, 2005, plaintiff was assigned to "no work" status due to his left hemiparesis (paralysis). On February 16, 2006, however, plaintiff requested that he be taken off of medically unassigned status so that he could get a job. He was advised to speak with case management staff.

On March 14, 2006, Tessema ordered and approved another physical therapy evaluation for plaintiff because it appeared that he was could regain additional motor and sensory function of his left hand. Plaintiff received physical therapy from March 15 to March 30, 2006. It was discontinued because the therapists were not sure if plaintiff's left-sided hemiparesis would further improve with therapy.

On May 10, 2006, Tessema ordered work boots for plaintiff and indicated that he could go back to work. Six days later plaintiff requested physical therapy. Tessema ordered another physical therapy evaluation and on June 18, 2006, plaintiff was evaluated and the therapist recommended exercises and electrical stimulation to plaintiff's left wrist and fingers. The physical therapy continued through mid-August 2006, at which time plaintiff indicated that he was tired of traveling to the physical therapy department and the therapist noted that plaintiff had reached the maximum benefits from physical therapy. Consequently, the therapist educated plaintiff on self-exercise programs and recommended discontinuation of his one-on-one therapy sessions.

Since October of 2006, plaintiff's condition continues to be monitored. Tessema prescribed a muscle relaxant (Baclofen) for plaintiff to help with pain, stiffness, and spasms from the hemiparesis.[11] On November 22, 2006, Nurse Practitioner Hammond requested that plaintiff be

---

[11] According to the record, plaintiff indicated that he was doing much better on the Baclofen.

provided a cane indefinitely. She also requested that plaintiff not have leg shackles applied and that he be handcuffed in the front so that he could use his cane. On February 8, 2007, Hammond evaluated plaintiff in the chronic care clinic for his three month follow-up appointment. Plaintiff indicated that he was doing well and that he was no longer taking Baclofen.

    5.  Conclusion

Undoubtedly, plaintiff presented a serious medical condition in early April of 2005. His carotid artery graft occluded. He did, however, receive an elective arterial graft at UMMC and was prescribed blood thinners in an attempt to prevent the graft from occluding. Follow-up testing two weeks later showed that the graft nonetheless appeared occluded. Two days after the duplex ultrasound was conducted and before the results were reviewed by MCIH medical personnel, plaintiff experienced a cerebrovascular event indicated by blurred vision, right-sided pain of his tongue and face, confusion, and slurred speech. He was taken to the dispensary and seen for a walk-up evaluation by a prison nurse and physician and transported to a local hospital where he was diagnosed with a stroke.[12] Plaintiff has since received various physical therapies, orthotic devices, anticoagulants to prevent further occlusions, muscle relaxants, and medication to help treat his neurological pain. At present, he still has paresis or weakness of his left hand but is able to perform his daily living activities.

Given the record before the court, I find that the medical regimen received by plaintiff after his 2005 arterial graft surgery was constitutionally adequate. Despite that care the graft occluded and apparently caused a right cerebral infarct, possibly caused by an clot. Unfortunately, this one of the possible complications of graft bypass surgery. The record shows that plaintiff's stroke

---

[12]  To the extent plaintiff complains that Nurse Reckley and Dr. Odunsi were negligent in their initial evaluation and diagnosis of his symptoms on April 23, 2005, he has failed to set out a colorable claim under § 1983.

symptoms were not ignored and he received necessary evaluation and treatment over the course of the following two years An Eighth Amendment violation has not been demonstrated and CMS is entitled to judgment in its favor.[13] A separate order effecting the rulings made in this memorandum is being entered herewith.[14]


Date: October 4, 2007                         /s/
                                              J. Frederick Motz
                                              United States District Judge

---

[13] Plaintiff seeks leave to amend the complaint to include Nurse Reckley and Dr. Odunsi as defendants for their alleged "negligence." Paper No. 20. In light of the materials before the court and my findings regarding the actions (or inactions) by medical staff, plaintiff shall not be granted leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (undue delay, prejudice, and futility are proper considerations for denying leave to amend). It is this court's opinion that plaintiff's allegations against Reckley and Odunsi set out, at best, a claim of medical negligence.

[14] Plaintiff has filed three separate requests for appointment of counsel. In his first motion he indicated that he had contacted various law firms but has been unsuccessful in obtaining representation. Paper No. 3. He further claims that his case is complex, he has no legal training and is unable to afford counsel, and his imprisonment will greatly limit his ability to litigate given his limitations on access to the WCI library. Paper Nos. 17 & 19. Plaintiff's first request for appointment of counsel was held *sub curia*. In light of the information presented to the court, the requests for appointment of counsel shall be denied.